# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ANITA BARNES RISER**
          **Plaintiff,**

     **v.**                               **Case No. 17-C-0707**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
               **Defendant.**

## DECISION AND ORDER

Plaintiff Anita Barnes Riser applied for social security disability benefits, alleging that she could no longer work due to back pain, obesity, and depression, but the Administrative Law Judge ("ALJ") assigned to the case concluded that she could, despite these impairments, perform a range of sedentary work. Plaintiff now seeks judicial review of that decision.

## I. BACKGROUND

### A.    Medical Evidence

On February 15, 2011, plaintiff underwent a lumbar MRI, which revealed mild degenerative changes in the lumbar spine and a paracentral lesion at the L5-S1 level (either a nerve sheath tumor/neurofibroma or disc protrusion). (Tr. at 304-05.) On June 15, 2011, she saw a rheumatologist, Dr. John Fahey, with continued severe pain despite physical therapy and cortisone shots. (Tr. at 282-83.) On exam, her lower back was tender, and she could not bend over very well. Dr. Fahey assessed osteoarthritis of the knee, aggravated by obesity, and an abnormal MRI requiring further evaluation. He injected her knee and encouraged her to see a neurosurgeon about the MRI. (Tr. at 284.) On July 1 and 8, 2011, Dr. Fahey provided

additional knee injections. (Tr. at 288-89, 292-93.)

On July 21, 2011, plaintiff established primary care with Dr. Adnan Nazir and Katie Larson, NP, regarding obesity, neurofibroma, and chronic back pain. On review of symptoms, she complained of joint swelling, pain, and muscle aches. She denied sadness, difficulty sleeping, or mood changes. (Tr. at 378.) On musculoskeletal exam, NP Larson noted adequately aligned spine, intact range of motion, normal muscular development, and normal gait. Psychologically, plaintiff was oriented, able to demonstrate good judgment and reason, and without hallucinations, abnormal affect, or abnormal behaviors. She was referred to Dr. Cully White, a neurosurgeon, and pain management. (Tr. at 379.) On August 14, 2011, NP Larson noted similar exam findings. (Tr. at 377.) On September 19, Larson noted evidence of mild para-spinal spasm, but normal gait, reflexes, and muscle tone. (Tr. at 375.)

On September 21, 2011, plaintiff saw Dr. White in consultation. On exam, she walked with a slow, stiff gait, and demonstrated evidence of reduced lumbar range of motion and positive straight leg raise. After discussing treatment options, they elected to proceed with L5-S1 epidural steroid injections. (Tr. at 318.)

An additional MRI taken on October 28, 2011, showed a large disc herniation at L5-S1 (Tr. at 684), and on October 31, 2011, Dr. Jack Deckard performed an L5-S1 laminectomy, right L5-S1 formaminotomy L5-S1, and diskectomy on the right at L5-S1. (Tr. at 684, 690-91.) Between November 3 and 12, 2011, plaintiff completed an in-patient rehabilitation program. (Tr. at 683-86.) She followed up with NP Larson on November 28, 2011, December 14, 2011, and January 9, 2012, walking with a limp and a cane, and was referred to pain management and physical therapy. (Tr. at 372, 370, 368.)

Plaintiff subsequently obtained treatment at the Center for Pain Management, receiving

2

medications and injections. (Tr. at 653, 675, 705-06, 436, 547, 587-88, 600-01.) She generally reported significant pain relief following an injection, although the pain would eventually return. (Tr. at 532, 543, 552, 558, 563, 566, 572, 603, 606.) At times, she reported that her medications worked well, keeping her pain tolerable and allowing her to be functional (Tr. at 572, 575, 582, 595, 606, 623, 635, 647); on other occasions, however, her pain was not adequately controlled (Tr. at 592, 612, 616, 629). Water aerobics helped relieve some of her pain. (Tr. at 575.) Her exams generally revealed pain on palpation of the lumbar region, limited active range of motion, and positive bilateral straight leg raise. (Tr. at 654, 658, 660, 663, 665, 667, 669, 671, 539.) Plaintiff also continued to see NP Larson and Dr. Nazir, with their exams generally reflecting intact range of motion, normal muscular development, and normal gait, but with mild para-spinal tenderness and positive straight leg raise. (Tr. at 365, 362, 359, 357, 354, 352, 349, 347, 344, 341, 339, 336, 439, 442, 446, 450, 470.) Plaintiff reported periodic falls when her right leg gave out (Tr. at 666, 350, 347, 670, 535, 546, 609, 615), and NP Larson noted that plaintiff sat on the left hip to avoid pressure on the right hip (Tr. at 352, 349, 347, 344, 341, 339). At times, plaintiff also reported lower extremity swelling. (Tr. at 500-02, 602, 460.)

A repeat MRI completed on August 23, 2012, revealed recurrence and increased size of the L5-S1 disc extrusion. (Tr. at 680.) However, further surgery was deferred until she could lose some weight. (Tr. at 676, 530, 538.) She followed up with Wisconsin Bariatrics, where she had previously undergone lap band surgery, but her weight loss progress stalled based on poor eating habits and limited exercise. (Tr. at 384-92.)

On October 1, 2012, NP Larson completed a residual functional capacity questionnaire, listing diagnoses of herniated lumbar disc, hypertension, and morbid obesity, and symptoms

of pain, fatigue, dizziness, numbness in the right leg, and limitations in ambulation, bending, and squatting.  Larson opined that plaintiff's symptoms would frequently interfere with the attention and concentration needed to perform simple work-related tasks, and that her medications caused side effects of fatigue/drowsiness.  Larson indicated that plaintiff could continuously walk one block, sit for 30 minutes, and stand/walk 30 minutes; in an eight-hour day, she could sit for four hours and stand/walk for four hours.  She needed a job that allowed shifting positions at will from sitting, standing, or walking.  (Tr. at 329.)  She could occasionally lift 10 pounds, never more.  She would likely be absent from work more than four times per month due to her impairments and was not physically capable of working a full-time schedule on a sustained basis.  (Tr. at 330.)

On January 26, 2014, Dr. Nazir completed a medical assessment form, listing diagnoses of asthma, chronic back pain, morbid obesity, and hypertension.  He indicated that plaintiff's symptoms would not cause her to be off task at least 15% of the day.  (Tr. at 496.)  He opined that plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, or climb stairs at a reasonable pace.  She needed a cane, or a walker at times, to ambulate.  She could walk ½ block without rest or severe pain, continuously sit for 20 minutes before she had to stand or lie down, and stand for 10 minutes before she had to walk, sit, or lie down.  (Tr. at 497.)  In an eight-hour day, she could sit for less than two hours and stand/walk less than two hours.  She needed six unscheduled breaks in an average workday and needed to elevate her legs at least two hours during a typical eight-hour daytime period.  She could rarely lift less than 10 pounds, never more, and never twist or stoop.  She could use her left hand to grasp and finger constantly, but her right hand less than occasionally.  She could use her right arm to reach less than occasionally, her left arm

4

occasionally. (Tr. at 498.) She would be absent more than four days per month due to her impairments. (Tr. at 499.)

On July 20, 2015, plaintiff saw Dr. Rizwanullah Arain for a neurology consult related to right arm pain and numbness. (Tr. at 491.) Dr. Arain ordered an EMG study (Tr. at 493), which revealed mild right carpal tunnel syndrome (Tr. at 494). He ordered physical therapy and a right wrist splint. (Tr. at 491.) A September 9, 2015, note indicates that plaintiff never went to physical therapy. (Tr. at 488-89.)

From October to December 2015, plaintiff received treatment for anxiety and depression at Acacia Wellness Center. (Tr. at 707-99.) During a psychiatric evaluation on October 8, 2015, Isaac Nagel, M.D., noted well-groomed appearance, cooperative attitude, depressed mood, stable affect, normal speech, goal-directed thought form, no suicidal/homicidal ideation, no evidence of delusions or hallucinations, intact cognition, and fair judgment/insight. (Tr. at 779-80.) He diagnosed episodic mood disorder and anxiety, with a GAF of 50,[1] continuing her on Wellbutrin and Cymbalta. (Tr. at 780.) During a subsequent office visit on October 22, 2015, plaintiff reported some improvement. She was working on raising money for her church.[2] On mental status exam, Dr. Nagel noted well-groomed appearance, normal gait, cooperative

---

[1]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 51-60 reflect "moderate" symptoms and 41-50 "severe" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). The fifth edition of the DSM abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th 2014).

[2]She had previously reported attending a weekly women's group at her church. (Tr. at 790.)

5

attitude, OK mood, stable affect, normal speech, goal-directed thought form, no suicidal/homicidal ideation, no evidence of delusions or hallucinations, intact cognition, and fair judgment/insight. He continued Cymbalta and Wellbutrin. (Tr. at 758.) On November 5, 2015, plaintiff told Dr. Nagel, "I am OK." (Tr. at 740.) On mental status exam, she again displayed well-groomed appearance, normal gait, cooperative attitude, OK mood, stable affect, normal speech, goal-directed thought form, no suicidal/homicidal ideation, no evidence of delusions or hallucinations, intact cognition, and fair judgment/insight. Dr. Nagel continued her medications. (Tr. at 741.) Plaintiff participated in several group (Tr. at 769-70, 763-64, 747-48) and individual therapy sessions, discussing issues with her children and feelings of guilt for not working (Tr. at 728, 720). She reported panic attacks and crying spells every day (Tr. at 729), although the medications helped reduce the anxiety (Tr. at 732). She further reported staying in her room all day in a house robe. (Tr. at 715.) Mental status exams revealed normal behavior, normal speech, normal insight and judgment, organized thought processes, and no evidence of delusions or hallucinations. (Tr. at 721, 716.) She was discharged from treatment in February 2016 due to missed appointments and lack of contact. (Tr. at 712, 797.)[3]

---

[3]Plaintiff received treatment for various other ailments during urgent care and emergency room visits, at which her primary impairments were referenced. For instance, on June 25, 2013, she went to the emergency room for vomiting and sharp abdominal pain. (Tr. at 419-21.) On exam, doctors noted no extremity tenderness and full range of motion in all extremities. (Tr. at 422.) On February 15, 2014, she went to the ER after she was hit on the head with a glass bottle, causing a laceration above the left eye. (Tr. at 401-02.) Doctors noted that she was able to walk without assistance but with some difficulty. (Tr. at 404.) They further noted no extremity tenderness, full range of motion of all extremities, and normal mood/affect. (Tr. at 405.) On January 12, 2015, plaintiff went to urgent care for left knee pain following a fall. She ambulated very well, refusing x-rays. (Tr. at 507.) On April 4, 2015, she went to urgent care for a urinary tract infection. (Tr. at 514, 518.) On exam, doctors noted normal gait and posture, as well as normal mood and affect. (Tr. at 515.) On September 21, 2015, she went to urgent care for sinus congestion. (Tr. at 523.) On exam, doctors noted normal gait and posture, mood and affect, judgment and insight. (Tr. at 525.) On November 1, 2015, she went to the

**B. Procedural History**

    **1. Plaintiff's Application and Supporting Materials**

On August 31, 2012, plaintiff applied for benefits, alleging a disability onset date of May 30, 2011. (Tr. at 189-95, 222, 226.) She alleged that she could no longer work due to nerve damage in the right leg and arm, surgery complications, morbid obesity, and high blood pressure. (Tr. at 226.) In a function report, plaintiff indicated that since her October 2011 surgery she had severe nerve damage to her right arm and leg, which caused falls. She could not sit or stand for long periods of time. (Tr. at 235.) She spent most of her time lying down, used a cane or walker when she got up to use the bathroom, and needed help with personal care. (Tr. at 236.) She sometimes prepared meals but did no housework. (Tr. at 237.) She could drive, shop, and handle money. (Tr. at 238.) She reported hobbies of reading and watching TV. She could not exercise to lose weight. She communicated with others by phone and computer. (Tr. at 239.) She indicated that she could not walk a block, lift over five pounds, bend, twist, or climb stairs. (Tr. at 240.) She used a cane when going out, a walker in her home. (Tr. at 241.) She took medications for pain, nerve damage, depression, and anxiety, which made her drowsy. (Tr. at 242.)

In a physical activities addendum, plaintiff reported that she stood 5'6-½" tall and weighed 285 pounds. She reported that she could continuously sit for 30 minutes, stand for 10 minutes, and walk for 10 minutes. In a day, she could sit for one hour, stand for 10 minutes,

---

ER following a motor vehicle accident in which she rear ended a stopped car, complaining of pain to the throat and right knee. (Tr. at 393.) ER personnel noted she was on her cell phone for a majority of triage and refused to hang up. (Tr. at 395.) On exam, doctors noted mild to moderate joint pain with movement of the right knee but no evidence of soft tissue swelling or acute instability. Her mood and affect were normal. X-rays showed no fractures. (Tr. at 396, 399-400.)

and walk for 30 minutes.  Her provider, Katie Larson, had limited to her to lifting five pounds. (Tr. at 243.)

## 2. Agency Decisions

The agency denied the application initially on May 23, 2013 (Tr. at 75-76, 131), based on the review of Pat Chan, M.D., who concluded that plaintiff could perform sedentary work with postural limitations (Tr. at 83-84), and Deborah Pape, Ph.D., who found that plaintiff's affective disorder caused no more than mild mental limitations (Tr. at 81-82).  Plaintiff sought reconsideration (Tr. at 140), but the agency denied that request on November 6, 2013 (Tr. at 127-28, 141), based on the review of Yacob Gawo, M.D. (Tr. at 107-09), and Larry Kravitz, Psy.D. (Tr. at 105-06), who largely agreed with the initial assessments.  Plaintiff then requested a hearing before an ALJ.  (Tr. at 147-48.)

## 3. Hearing

On February 2, 2016, plaintiff appeared with counsel before the ALJ.  The ALJ also summoned a vocational expert ("VE").  (Tr. at 35.)

Plaintiff testified that she was 47 years old with a high school degree and a cosmetology license.  (Tr. at 40-41.)  She last worked in 2011 doing hair; she stopped doing that work because of back pain.  (Tr at 41-42.)  Before that, she worked as a bank teller and manager at a fast food restaurant.  (Tr. at 42-43.)  She supported herself through W2 benefits; she had two minor children, ages 17 and 10, and acted as guardian for her five year old nephew; she also had an adult daughter, age 27.  (Tr. at 44-45, 47.)

Plaintiff testified that her 27 year old daughter did the shopping and the older two children did the housework.  She did not do any of that.  (Tr. at 48.)  Her adult daughter came

to her home every day to make sure the younger kids got on the bus and got home, prepared dinner, washed dishes, and made sure the clothes were clean. (Tr. at 55-56.) Plaintiff spent most of her time laying down, reading, and watching TV. (Tr. at 56.)[4]

Plaintiff testified that she could no longer work an office job because she had to prop up her legs and could not sit or stand for long; she spent most of the day in bed. (Tr. at 49.) She also suffered from right carpal tunnel syndrome for which she had a splint. (Tr. at 50.) She indicated that she could lift just eight pounds, no more. (Tr. at 51.) She testified that she was on her feet most of the time and had to lift at least 80 pounds when working as a bank teller and restaurant manager. (Tr. at 53-54.) She also did hair on her feet. (Tr. at 54.)

Plaintiff saw pain management, where she received medication and a series of injections. The injections gave her some relief. (Tr. at 57.) She had been using pain patches since 2014 and a cane since 2011. She had also been prescribed a walker in 2014 due to falls. (Tr. at 58-59.) When sitting, she elevated her legs because of swelling. (Tr. at 60.) She was not a candidate for further surgery unless she lost weight. She currently stood 5'4-½" tall and weighed 290 pounds. Her weight had fluctuated between 250 and 324 pounds over the past few years. (Tr. at 62.) She estimated that she could sit for about 20 minutes before she had to change positions. (Tr. at 63.) She testified that her entire right side was numb. She had pain across her lower back and down her left leg. The pain was excruciating. (Tr. at 63.) She had taken a number of different pain medications and used a pain patch. She took Percocet, which helped, but made her drowsy. (Tr. at 64.) She concluded that she could not work due to back pain and the need to elevate her legs. (Tr. at 65.)

―――――――――――――

[4]Plaintiff testified that she stopped driving over a year ago. The ALJ noted that she had been in an accident in November 2015, but plaintiff indicated she was a passenger. (Tr. at 46.)

9

The VE classified plaintiff's past work as a hairdresser as skilled, light generally, light to medium as plaintiff performed it; bank teller as semi-skilled, medium generally, medium to heavy as performed; fast food manager as skilled, light generally, medium to heavy as performed; and fast food worker as unskilled, light generally, medium to heavy as performed. (Tr. at 70-71.)  The  ALJ then asked a hypothetical question, assuming a person limited to sedentary work, unable to climb ladders, ropes, or scaffolds, and limited to frequent stooping, kneeling, and crawling.  (Tr. at 71-72.)  The VE testified that such a person could not perform plaintiff's past work but could do other unskilled jobs, such as order clerk, information clerk, and office helper.  (Tr. at 72-73.)  The need to change positions between sitting and standing every 30 minutes would not affect these jobs, but the need to elevate the legs to waist level would not be compatible with sedentary work.  (Tr. at 73-74.)

### 4.    ALJ's Decision

On April 20, 2016, the ALJ issued an unfavorable decision.  (Tr. at 17.)  The ALJ determined that plaintiff had not engaged in substantial gainful activity since May 30, 2011, the original alleged onset date,[5] and that she suffered from the severe impairments of degenerative disc disease and obesity.  (Tr. at 22.)

The ALJ found plaintiff's affective disorder non-severe, in that it caused no more than minimal limitation in her ability to perform basic mental work activities.  (Tr. at 22.)  In making this determination, the ALJ considered the four broad functional areas set out in the regulations.  (Tr. at 23.)

First, the ALJ found no limitation in activities of daily living.  While plaintiff alleged

---

[5]In a post-hearing submission, plaintiff amended the alleged onset date to August 1, 2012.  (Tr. at 273.)

10

significant restrictions, they related to physical as opposed to mental symptoms. Plaintiff reported no disabling mental problems in the disability report accompanying her application, and in her later function report indicated that she prepared meals as her physical symptoms allowed, shopped with a motorized cart, handled finances, read, watched TV, and used a computer. Although she denied driving a car, records reflect that she was involved in an accident in November 2015. In January 2014, she reported doing water aerobics, and in October 2015 she reported raising money for her church. (Tr. at 23.)

Second, the ALJ found no limitation in social functioning. Plaintiff lived with her children and five-year-old nephew for whom she was guardian. She reported that she stayed in touch with others regularly by telephone and computer. She had also been involved in fund-raising for her church and regularly attended a women's group meeting sponsored by her church. (Tr. at 23.)

Third, the ALJ found mild limitation in concentration, persistence, and pace. Plaintiff reported difficulties with concentration and completing tasks due to depressive symptoms stemming from ongoing physical limitations. She underwent counseling in 2015 for general depressive symptoms. She reported that physical limitations, as well as problems with her daughter, made her feel like a failure. She stated that she stayed in her robe and in her room all day long. However, mental status evaluations routinely noted her to present as well-groomed, pleasant, and with appropriate eye contact. Her insight and judgment were within normal limits, her thought processes were organized and relevant, and her affect congruent. She failed to appear at various appointments and was discharged. She also maintained varied activities and social interaction. The ALJ concluded that she had difficulties in this area, but they were not more than mild. (Tr. at 23.)

Finally, plaintiff had experienced no episodes of decompensation of extended duration. Because plaintiff's mental impairment caused no more than mild limitations in the first three areas, and no episodes of decompensation in the fourth, the ALJ found the mental impairment non-severe. (Tr. at 23.)

The ALJ next determined that neither of plaintiff's severe impairments met or equaled the severity of one of the conclusively disabling impairments in the Listings. The ALJ considered plaintiff's disc disease under Listing 1.04, finding no evidence of nerve root or spinal cord compromise with either nerve root compression or spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication. The record showed that plaintiff was 67 inches tall and 269 pounds, producing a Body Mass Index ("BMI") of 42.1, characterized as obese. The ALJ noted that there is no specific Listing for obesity, but that this impairment could have an adverse impact on co-existing impairments and may limit a claimant's ability to sustain activity on a regular and continuing basis; the ALJ indicated that he took this into account in evaluating plaintiff's disability claim. (Tr. at 24.)

The ALJ then found that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except no climbing of ladders, ropes, or scaffolds; frequent stooping, crouching, kneeling, and crawling; and the ability to change positions between sitting and standing every 30 minutes. (Tr. at 24.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 25.)

Plaintiff alleged in the disability report accompanying her application that her ability to work was limited by nerve damage in her right arm and leg, surgery complications, obesity, and high blood pressure. She reported that she stopped working in May 2011 because of these conditions. In her February 2013 function report, plaintiff alleged ongoing symptoms of

numbness in her right upper and lower extremities resulting in unstable gait and limitations on her ability to walk, sit, or stand for an extended period. She reported that she was limited to sitting 30 minutes and standing/walking 10 minutes at a time. She further alleged that she had been assessed a five pound lifting restriction in 2011. She indicated that these limitations interfered with her ability to tend to her personal care and prevented her from doing any housework or exercising in order to lose weight. She stated that she used a walker at home and a cane when she went outside. At the hearing, plaintiff testified that she lived with her two children and five-year-old nephew. She stated that she spent most of the day in bed and did no cleaning or shopping due to her physical problems. Her adult daughter came over to make sure the kids got to and from school, prepare dinner, and make sure her clothes were clean. Plaintiff testified that she experienced pain and numbness extending down her entire right side and across her back to her left leg and knee. She described her back pain as excruciating and reported medication side effects that made her drowsy. She reported experiencing a number of falls. Regarding her weight, she indicated that she had gastric banding surgery, but that she required another procedure as her weight had fluctuated between 250 and 325 pounds. (Tr. at 25.)

The ALJ concluded that while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements regarding the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 26.) He continued: "[Her] statements regarding the intensity and persistence of pain and other symptoms and their functionally limiting effects on her physical capabilities are not adequately supported by the totality of the medical evidence." (Tr. at 26.) Plaintiff reported a

history of back pain that progressively worsened despite conservative treatment. An MRI showed mild degenerative changes and a broad-based disc protrusion. She was also assessed as obese with a history of lap band surgery. In October 2011, she underwent an L5-S1 laminectomy with discectomy but continued to report lumbar pain symptoms with radiation to the right lower extremity. A lumbar MRI in August 2012 showed a recurrence and increased size of the L5-S1 disc extrusion. She was referred to a pain management clinic and treated conservatively with therapy modalities including steroid injections and medication management. Her surgeon and pain management doctors directed her to lose weight and dietary changes were discussed in detail. She participated in water aerobics for a time and reported losing some weight and feeling generally better. However, she did not adhere to dietary changes and continued to exhibit poor eating habits with minimal exercise. (Tr. at 26.)

The ALJ further noted that, contrary to her report of inability to walk without an assistive device, the record consistently reflected examinations demonstrating normal unassisted gait. As support, he cited three treatment notes from Dr. Nazir reporting normal gait with intact spinal range of motion and normal musculature development. Plaintiff also presented to the emergency department in June 2013 with complaints of vomiting, and an examination at that time found full range of motion without compromised gait. (Tr. at 26.)

Dr. Nazir completed a medical assessment form, opining that plaintiff required an assistive device to ambulate, could sit for only 20 minutes and stand for 10 minutes at a time, would require six unscheduled breaks a day, would never be able to lift 10 pounds or twist/bend, and would be absent from work more than four days per month as a result of her impairments. The ALJ concluded that these "dramatic limitations are unsupported by – and contrary to – the evidence when considered in its entirety as well as Dr. Nazir's own findings

14

on examination." (Tr. at 26.)

Plaintiff reported improvement with eating healthier and doing water aerobics. She also stated that she had achieved significant relief of her back pain following an injection, with increased range of motion. Subsequent records reflect treatment for being hit on the head with a beer bottle in 2014 and a car accident in 2015. No back complaints were reported nor were any findings noted. (Tr. at 27.)

Mild spasm was noted on examination in July 2014 with normal gait, tone, strength, and reflexes. Plaintiff reported a two-week history of lower leg edema in August 2014. Examination at that time noted normal gait and posture. In January 2015, plaintiff presented with a report of left knee pain for the past week and an examination again reflected normal gait and posture. She complained of intermittent sinus congestion in September 2015 with normal gait and posture noted on examination. (Tr. at 27.)

The state agency medical consultants, Drs. Chan and Gawo, reviewed the evidence independently and separately concluded that plaintiff's physical impairments limited her to sedentary work with postural restrictions. The ALJ found their opinions generally consistent with the evidence and gave them some weight. He did incorporate into the RFC an allowance for changing positions every 30 minutes to accommodate plaintiff's report of the need to alternate positions as well as Dr. Nazir's opinion in this regard. (Tr. at 27.)

NP Larson offered an opinion substantially supporting sedentary work but concluding that plaintiff would be off work more than four times per month. That ALJ indicated that Larson is not an acceptable medical source and demonstrated no expertise in any vocational area to support the off-work component of her opinion. The ALJ have her opinion no weight. He nonetheless found it interesting that she opined plaintiff could lift and carry 10 pounds

occasionally, contrary to plaintiff's report that she was given a five pound lifting restriction by Larson. (Tr. at 27.)

The ALJ further found that the evidence did not support a finding of a severe mental impairment. In reaching this conclusion, the ALJ considered the opinions of the state agency psychological consultants, Drs. Pape and Kravitz, each of whom reviewed the evidence and concluded that plaintiff had no mental restrictions on activities of daily living and no more than mild difficulties in the other functional areas. The ALJ found these opinions consistent with the evidence and afforded them substantial weight. (Tr. at 27.)

In sum, the ALJ found that the record did not support a finding of total disability. Rather, plaintiff remained capable of performing regular work tasks within the restrictions assessed in the RFC. The ALJ accommodated plaintiff's severe physical impairments by limiting her to sedentary work with postural restrictions. The record contained references to use of a cane; however, normal gait was frequently noted in the evidence. Nonetheless, use of a cane, if necessary, is compatible with sedentary work. (Tr. at 27.) The ALJ addressed plaintiff's reports of need to change positions to relieve symptoms with an appropriate allowance in the RFC assessment. The evidence did not support further limitations. (Tr. at 28.)

Plaintiff previously worked as a hairdresser, fast food worker, and fast food manager. The VE testified that plaintiff could not perform any of these jobs within the restrictions assessed in the RFC. (Tr. at 28.) However, the VE further testified that plaintiff could, within the RFC, perform other jobs such as order clerk, information clerk, and office helper. The ALJ accordingly found plaintiff not disabled. (Tr. at 29.)

On March 28, 2017, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. <u>See</u>

Lanigan v. Berryhill, 865 F.3d 558, 563 (7th Cir. 2017). This action followed.

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to determine whether it applies the correct legal standards and is supported by substantial evidence. Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Id. The court will not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ. Id. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the ALJ. E.g., Schoenfeld v. Apfel, 237 F.3d 788, 793 (7th Cir. 2001).

Nevertheless, while judicial review is deferential, "it is not abject." Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). A decision that lacks an adequate discussion of the important issues or fails to mention highly pertinent evidence will be remanded. See, e.g., id.; Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).

## III. DISCUSSION

Plaintiff argues that the ALJ's finding that she could perform a range of sedentary work is not supported by substantial evidence. (Pl.'s Br. at 13.) She specifically contends that the ALJ erred in (1) evaluating the credibility of her statements, (2) rejecting Dr. Nazir's opinion, (3) finding her mental impairment not severe, and (4) failing to mention the problems with her right arm and hand. (Pl.'s Br. at 14-15, 18.) I agree with the second and fourth contentions, and thus remand for further proceedings.

## A.    Symptom Evaluation

In evaluating the credibility of a claimant's statements regarding her symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5; SSR 96-7p, 1996 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  SSR 16-3p, 2016 SSR LEXIS 4, at *9; SSR 96-7p, 1996 SSR LEXIS 4, at *5-6.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of pain or other symptoms; and measures other than treatment used to relieve pain or other symptoms.[6]  SSR 16-3p, 2016 SSR LEXIS 4, at *18-19; SSR 96-7p, 1996 SSR LEXIS 4, at *8.  The court reviews an ALJ's credibility finding deferentially, reversing only if it "patently wrong."  <u>Summers</u>, 864 F.3d at 528.

---

[6]SSR 16-3p went into effect in March 2016 (shortly before the ALJ issued his decision in this case), replacing SSR 96-7p.  The new Ruling eliminates use of the term "credibility" and clarifies that "subjective symptom evaluation is not an examination of an individual's character." 2016 SSR LEXIS 4, at *1.  The Seventh Circuit has noted that this "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain <u>assertions</u> by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence."  <u>Cole v. Colvin</u>, 831 F.3d 411, 412 (7th Cir. 2016). The new Ruling requires use of the same two-step test and consideration of the same factors.

18

The ALJ followed the required two-step process in this case, finding that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of those symptoms were not "not entirely consistent" with the evidence of record. (Tr. at 26.) In support, he primarily relied on examination findings of normal, unassisted gait and full range of motion; plaintiff's reported improvement with treatment; and her failure to comply with dietary and exercise recommendations.

Plaintiff makes no claim of legal error; rather, she contends that the ALJ cited only limited parts of the record, discussing three occasions in which her treating doctor noted normal gait, three emergency room visits when back problems were not mentioned, and one occasion when she reported relief from an injection. Plaintiff stresses other records suggesting more serious problems. (Pl.'s Br. at 15.)

While the ALJ cannot simply "cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding," Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010), he is not required to "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ referenced much of the evidence plaintiff now cites, including the August 2012 MRI showing a recurrent disc extrusion (Tr. at 26), and plaintiff fails to identify specific lines of evidence that were overlooked.

Plaintiff suggests that the ALJ should not have relied on the records of ER visits for other medical problems, but she cites no authority requiring the ALJ to ignore this evidence. See Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) (stating that "it is entirely permissible to examine all of the evidence" in determining whether the claimant's testimony about the effects

of his impairments is credible or exaggerated). Plaintiff also faults the ALJ for citing only a handful of examples of normal gait, but the record amply supports the ALJ's statement that "the record consistently reflects examinations demonstrating normal gait." (Tr. at 26; see, e.g., Tr. at 539, 356, 349, 344, 339, 336, 439, 442, 446, 450, 454, 458, 466, 470.)[7] The record also supports the ALJ's conclusion that plaintiff experienced some improvement with weight loss, exercise, and injections. (Tr. at 27, 672-73, 532, 552, 563, 572, 575, 603.) To be sure, there is evidence that plaintiff's pain and other limitations persisted, but it "is the responsibility of the ALJ, not of a reviewing court, to resolve conflicting evidence and to make credibility determinations." Brewer v. Chater, 103 F.3d 1384, 1392 (7th Cir. 1997); see also Roovers v. Colvin, No. 14-C-370, 2015 U.S. Dist. LEXIS 8538, at *16-17 (E.D. Wis. Jan. 26, 2015) ("[I]nstead of requiring conclusive evidence that a claimant is not telling the truth, the ALJ need only provide reasons based on the record as a whole why the claimant's testimony was not fully credited.").

Plaintiff argues that the ALJ should not have considered her failure to lose weight. (Pl.'s Br. at 16.) She relies on SSR 02-1p, which notes that obesity "is generally the result of a combination of factors (e.g., genetic, environmental, and behavioral)," 2002 SSR LEXIS 1, at *3; that "in most people the effect of treatment is limited," id. at *23; and that the agency "will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits," id. at 25. However, the ALJ did not find plaintiff disabled because of obesity or a combination of obesity and another impairment, then deny benefits because she failed to follow a treatment

---

[7]See Stevens v. Colvin, 169 F. Supp. 3d 887, 894-95 (E.D. Wis. 2016) (noting that it is not a violation of the Chenery doctrine to respond to a claimant's argument that the ALJ "cherry-picked" favorable evidence and ignored unfavorable evidence by citing additional evidence in the record that supports the finding made by the ALJ).

plan for weight loss.  Rather, he discussed the weight loss and exercise recommendations made by plaintiff's providers, as the Rulings require (i.e., "treatment, other than medication"), in the course of evaluating the credibility of her statements.  Losing weight is not simply a matter of will, as plaintiff notes, and I agree that ALJs should consider this factor with care.  However, plaintiff cites no authority precluding an ALJ from discussing it as part of his credibility analysis.  See Nelson v. Barnhart, No. 06-C-249-C, 2006 U.S. Dist. LEXIS 78129, at *25 (W.D. Wis. Oct. 24, 2006) ("The ALJ relied on plaintiff's failure to lose weight as one circumstance in the totality that he considered when assessing the credibility of her subjective complaints."), adopted,  2006 U.S. Dist. LEXIS 85155 (W.D. Wis. Nov. 22, 2006).  And the ALJ did not place undue emphasis on this factor in the present case.  See Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'); Halsell v. Astrue, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are[.]").[8]

Finally, plaintiff contends that, while the ALJ criticized her for failing to lose weight, he failed to assess the impact of obesity on her ability to sustain full time employment.  (Pl.'s Br. at 16.)  The ALJ found plaintiff's obesity to be a severe impairment, and he acknowledged that obesity may have an impact on a person's ability to sustain activity on a regular and continuing basis.  (Tr. at 24.)  He then found that she retained the RFC for a reduced range of sedentary work.  (Tr. at 24.)  While he did not specifically explain how obesity factored into the RFC,

---

[8]The same is true of the ALJ's statement that plaintiff "had been treated conservatively." (Tr. at 26.)  As plaintiff notes, she received a variety of treatments, including medication, therapy, and injections, and her doctors recommended a second surgery after she lost weight. (Pl.'s Br. at 16.)  However, the ALJ did not place undue weight on this questionable observation.

21

plaintiff does not say what additional limitations he should have added based on her weight. Any error was harmless.  See Hernandez v. Astrue, 277 Fed. Appx. 617, 624 (7th Cir. 2008) ("Here the ALJ did not explicitly discuss the exacerbating effects of Hernandez's obesity on her other limitations when arriving at her RFC, but the error was harmless.  Hernandez did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning – as it was her burden to do.") (internal citation omitted).

B.    **Treating Source Report**

Under the regulations in effect at the time of the ALJ's decision, the opinion of a claimant's treating physician regarding the nature and severity of a medical condition is entitled to "controlling weight" if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  Israel v. Colvin, 840 F.3d 432, 437 (7th Cir. 2016); 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017.").  If the opinion does not meet the test for controlling weight, the ALJ must decide what other weight it does deserve, considering a checklist of factors including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.  Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010).  The ALJ must provide "good reasons" for discounting the opinion of a treating physician.  20 C.F.R. § 404.1527(c)(2); see also Israel, 840 F.3d at 437.  The Seventh Circuit has nevertheless stated, "If the ALJ discounts the physician's opinion after considering [the checklist] factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons – a very deferential standard that we have, in fact, deemed lax."  Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) (internal quote marks omitted).

In the present case, the ALJ considered the medical assessment form completed by plaintiff's primary physician, Dr. Nazir, which, as discussed above, endorsed significant restrictions on plaintiff's ability to work. The ALJ stated: "These dramatic limitations are unsupported by – and contrary to – the evidence when considered in its entirety as well as Dr. Nazir's own findings on examination." (Tr. at 26.) While the ALJ did not elaborate, he was presumably referring to the same examination findings he cited in discussing credibility, e.g., normal gait and intact spinal range of motion. See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("We do not discount it simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant.").

Given the "lax" standard of review set forth above, this might suffice on the initial question of controlling weight. As plaintiff notes, however, the ALJ said nothing about the checklist factors in deciding what other weight, if any, the report deserved. (Pl.'s Br. at 17.)

The Commissioner indicates that Dr. Nazir did not explain the basis for his opinion or cite specific, supporting evidence. (Def.'s Br. at 4.) However, the ALJ did not reject the report on these grounds, and my review is limited to the reasons he provided. See, e.g., Campbell, 627 F.3d at 306 ("Our review is limited to the reasons articulated by the ALJ in her decision."). The Commissioner notes that Dr. Gawo, the agency medical consultant at the reconsideration level, considered the report from NP Larson, which reflected many of the same limitations endorsed by Dr. Nazir, finding it "without substantial support from other evidence of record, which renders it less persuasive." (Tr. at 110.) While the ALJ gave "some weight" to the agency medical consultant reports (Tr. at 27), he did not rely on Dr. Gawo's assessment in discounting the opinions of Dr. Nazir or NP Larson. He rejected NP Larson's report because she "is not an acceptable medical source and has no demonstrated expertise in any vocational

area to support the off-work component of her opinion." (Tr. at 27.)  This, too, was problematic.

See, e.g., Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) (explaining that while

opinions from other medical sources may not receive controlling weight, they are entitled to

consideration); Dogan v. Astrue, 751 F. Supp. 2d 1029, 1038 (N.D. Ind. 2010) (reversing where

ALJ rejected report of nurse practitioner just because she was not an acceptable medical

source).[9]  The matter must be remanded for reconsideration of the treating provider reports.

## C.    Mental Impairment

Mental impairments are evaluated using a "special technique."    20 C.F.R. §

404.1520a(a).  Under the regulations in effect at the time of the ALJ's decision, the ALJ rates

the degree of functional limitation in four broad functional areas: activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation. Pepper v.

Colvin, 712 F.3d 351, 365 (7th Cir. 2013).   The first three functional areas are rated on a

five-point scale: none, mild, moderate, marked, and extreme, and the final area on a four-point

scale: none, one or two, three, four or more.  Id.  If there are no episodes of decompensation

and the rating in each of the first three categories is none or mild, the impairment may generally

be deemed non-severe.  Richards v. Astrue, 370 Fed. Appx. 727, 730 (7th Cir. 2010).

As indicated above, the ALJ deemed plaintiff's affective disorder non-severe, finding no

limitation in activities of daily living and social functioning; mild limitation in concentration,

persistence, and pace; and no episodes of decompensation.  (Tr. at 23.)  Plaintiff does not

claim any legal error in the ALJ's application of the special technique.  Rather, she contends

---

[9]It is unclear what sort of expertise the ALJ envisioned a source would need in order to opine on the issue of absences due to the claimant's impairments.  This would appear to be a medical rather than a vocational question.  Cf. Fuller v. Astrue, 766 F. Supp. 2d 1149, 1161 (D. Kan. 2011).

that his finding is contrary to the record, citing treatment notes documenting symptoms of sadness, panic attacks, and low self-esteem. (Pl.'s Br. at 17.) Plaintiff argues that, while her mental impairment is not Listing level, it is more than a slight impairment and impacts her ability to stay on task, respond to changes, and deal with stress. (Pl.'s Br. at 18.) The ALJ considered the symptoms recorded in the mental health treatment notes, but contrasted them with the normal mental status evaluations, plaintiff's discharge from treatment due to missed appointments, and her varied activities and social interaction. (Tr. at 23.) He also gave substantial weight to the opinions of the agency psychological consultants, Drs. Pape and Kravitz, who found no more than mild difficulties in the functional areas, including concentration, persistence, and pace. (Tr. at 27.) Plaintiff cites no medical opinion endorsing greater limitations in this area, and her argument boils down to a contention that the ALJ should have reached a different conclusion.

> But an ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to his cause. The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).

Sanders v. Colvin, 600 Fed. Appx. 469, 470 (7th Cir. 2015).

## D.    Arm and Hand Problems

An RFC determination must account for all impairments, even those that might not be severe in isolation. Murphy v. Colvin, 759 F.3d 811, 820 (7th Cir. 2014). In the present case, Dr. Arain diagnosed carpal tunnel syndrome, prescribing physical therapy and a right wrist splint (Tr. at 491-94), and Dr. Nazir opined that plaintiff could use her right arm and hand less than occasionally (Tr. at 498). The ALJ said nothing about plaintiff's arm and hand problems.

See Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984) ("[W]hen the ALJ fails to mention rejected evidence, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (internal quote marks omitted).[10]   Nor did he include any manipulative limitations in his hypothetical questions to the VE.  See Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015) ("In this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record.") (internal quote marks omitted).  This oversight cannot be dismissed as harmless, as the VE identified unskilled, sedentary jobs (Tr. at 72), which generally require good use of both hands and the fingers.  SSR 96-9p, 1996 SSR LEXIS 6, at *22.  The matter must be remanded for consideration of possible manipulative limitations.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 3rd day of April, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[10]As indicated above, the ALJ considered Dr. Nazir's report, but he did not discuss the recommended limitations on use of the hand and arm.  (Tr. at 26.)  The ALJ partially credited Dr. Nazir's report regarding the need for a sit-stand option (Tr. at 27), so I cannot assume that he rejected the manipulative limitations.